FILED

FEB 1 3 2013

WILLIAM B. GUTHRIE
Clerk, U.S. District Court
By_____ Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

JOSHUA MODE, ROBERT JOHNSTON,       )
ROCKY MAKOVY AND                    )
TERRY STITES                        )
        Plaintiffs,                 )
                     )
                     )   Case No. CIV 13 - 0 6 9 - RAW
v.                                  )
                     )
THE KANSAS CITY SOUTHERN            )
RAILWAY COMPANY,                    )   COMPLAINT AND JURY
DEMAND                              )
a corporation,                      )
                     )
        Defendant.                  )

## COMPLAINT

Serve: The Corporation Company
       1833 S. Morgan Road
       Oklahoma City, OK 73128

## NATURE OF ACTION

1.     Plaintiffs Joshua F. Mode, Robert Johnston, Rocky Makovy, and Terry

Stites, by and through undersigned counsel, bring this action against Defendant  Kansas

City Southern Railway Company ("KCS") for adverse actions, pattern and practices of

illegal, intimidating and retaliatory activities by KCS against Plaintiffs in violation of the

employee protection provisions of the Federal Railroad Safety Act, 49 U.S.C. §20109 ("§

20109"), the Implementing Recommendations of the 9/11 Commission Act (Public Law

110-53), and the Rail Safety Improvement Act (Public Law 110-432.), all collectively

referred to herein as "§ 20109".

waiver form provided

## JURISDICTION

2.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 49 U.S.C. § 20109.

## VENUE

3.      Venue is proper pursuant to 28 U.S.C. § 1391 because the adverse actions occurred here, the Defendant does business here, and the Plaintiff lives here.

## PARTIES

4.      Plaintiff Joshua F. Mode ("Mr. Mode"), born on January 3, 1988 and presently 25 years of age, is an Oklahoma resident and was terminated by KCS. Mr. Mode hired on with KCS on August 14, 2008 at age 20, and had been with the railroad just over two (2) years at the time of the adverse actions described herein, including but not limited to, September 1, 2010, February 28, 2011, December 28, 2011, January 4, 2012, January 24, 2012 and January 30, 2012. Mr. Mode is a member of the class for which protective legislation was enacted, was employed by KCS, within the meaning of 49 U.S.C. §20109, and is personally and adversely affected by the actions of KCS within the meaning of 49 U.S.C. §20109, and the work he performed directly and substantially further and affected interstate commerce.

5.      Plaintiff Robert Johnston ("Mr. Johnston") born on December 13, 1985 and presently 27 years of age, is an Oklahoma resident and is employed by the Defendant. Mr. Johnston hired on with KCS on April 27, 2005 at age 19, and had been with the railroad approximately 5 ½ years at the time of the adverse actions herein, including but not limited to, December 28, 2011, January 4, 2012, January 24, 2012 and January 30, 2012, May 5, 2012, May 30, 2012, August 10, 2012, August 15, 2012. Mr. Johnston is a

member of the class for which protective legislation was enacted, was employed by KCS, within the meaning of 49 U.S.C. §20109, and is personally and adversely affected by the actions of KCS within the meaning of 49 U.S.C. §20109, and the work he performed directly and substantially further and affected interstate commerce.

6.     Plaintiff Rocky Makovy ("Mr. Makovy") born on January 20, 1983 and presently 30 years of age, is Oklahoma resident and is employed by KCS. Mr. Makovy hired on with KCS on August 9, 2004 at age 21, and had been with the railroad approximately 7 1/4 years at the time of the adverse actions herein, including but not to, December 28, 2011, January 4, 2012, January 24, 2012 and January 30, 2012. Mr. Makovy is a member of the class for which protective legislation was enacted, was employed by KCS, within the meaning of 49 U.S.C. §20109, and is personally and adversely affected by the actions of KCS within the meaning of 49 U.S.C. §20109, and the work he performed directly and substantially further and affected interstate commerce.

7.     Plaintiff Terry Stites ("Mr. Stites") was born on February 22, 1968 and presently 44 years of age, is an Oklahoma residents and is employed by KCS. Mr. Stites hired on with KCS on June 14, 2004 at age 36, and had been with the railroad approximately 6 ½ years at the time of the adverse actions herein, including but not limited to, December 28, 2011, January 4, 2012, January 24, 2012 and January 30, 2012. Mr. Stites is a member of the class for which protective legislation was enacted, was employed by KCS, within the meaning of 49 U.S.C. §20109, and is personally and adversely affected by the actions of KCS within the meaning of 49 U.S.C. §20109, and the work he performed directly and substantially further and affected interstate

commerce.

8.     KCS is and was at all times relevant to this Complaint the employer of Plaintiffs and a corporation engaged in the operation of a system of railways as a common public carrier of freight for hire between the various states of the United States and engaged in the transportation of freight in and between many states of the United States, including the state of Oklahoma, and is a railroad carrier within the meaning of 49 U.S.C. §20109 and 49 U.S.C. §20102.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

9.     On July 7, 2012, Plaintiffs filed a Complaint under § 20109 with the United States Department of Labor and the Occupational Safety and Health Administration (OSHA). Plaintiffs' Complaint was filed within 180 days of the date he became aware of KCS's adverse or unfavorable and retaliatory personnel actions against them.

10.     OSHA commenced its investigation and Plaintiffs fully cooperated with the investigation. OSHA dismissed Plaintiffs' Complaint on August 13, 2012.

11.     On September 7, 2012, Plaintiffs, timely filed a Notice of Objection and Request for Hearing with the Department of Labor, Office of Administrative Law Judges.

12.     October 8, 2012, Plaintiffs filed an Amended Complaint.

13.     On January 30, 2013, Plaintiffs filed  Notice of Intention to File Original Action in United States District Court under the provision of 49 U.S.C. § 20109(d)(3).

14.     The Secretary of Labor has not issued a final decision within 210 days after the filing of the § 20109 Complaint. The delay is not due to any bad faith on the part of Plaintiffs.

15.     Pursuant to 49 U.S.C. § 20109(d)(3), Plaintiffs is now bringing this original action at law and equity for *de novo* review by the United States District Court, which Court has jurisdiction over this action without regard to the amount in controversy.

### STATEMENT OF OPERATIVE FACTS
### REGARDING PLAINTIFFS' PROTECTED ACTIVITIES AND ADVERSE ACTIONS
### BY KCS IN VIOLATION OF THE RAILROAD SAFETY ACT, 49 U.S.C. §20109

16. Plaintiffs adopt by reference and re-allege each and every allegation contained this entire Complaint as though set forth fully herein.

17. On September 1, 2010, Mr. Mode suffered an injury to his left ankle.  That injury was followed shortly thereafter by a refusal of medical treatment, and negative and adverse actions by one of Mr. Mode's supervisors, Tim Livingston.  On February 28, 2011, Mr. Mode filed an OSHA Complaint for the refusal of medical treatment and the negative and adverse actions taken against him.  That Complaint was OSHA captioned: *Joshua Mode / The Kansas City Southern Railway Company/ 6-3550-11-051.* Said Complaint was resolved by a Settlement Agreement with a monetary payment to Mr. Mode, and agreements concerning training of management, Compliance with Acts, and purging Mr. Mode's Personnel Records of any correspondence, discipline records, or risk identifiers that might negatively impact Mr. Mode's employment.

18. On December 27, 2011, Mr. Mode went on duty for KCS at 11:59 p.m., along with co-workers Mr. Rocky Makovy and Mr. Mark Crabtree.

19.  On December 28, 2011, Mr. Makovy and Mr. Crabtree completed their work for the night, and went into the office around 7:30 a.m. or 8:00 a.m., to "tie up," or in other words, handle their paperwork for going off-duty.  After Mr. Mode tied up, he walked into office where Trainmaster Michael "Mike" Pollard ("Trainmaster Pollard")

was working for KCS.

20. Trainmaster Pollard had replaced the previous Trainmaster, Mr. Tim
Livingston, who was the offender in Mr. Mode's earlier Complaint referenced
hereinabove. Mr. Livingston had been promoted to a job in Kansas City. Mr. Livingston
had in the eyes of KCS employees, including, but not limited to, the Plaintiffs, typically
behaved with a very strict managerial custom, routine and practice and claimed to be a
by-the-rules official who always attempted to maintain a perceived strict boss-employee
arms-length relationship.

21. Trainmaster Pollard, on the other hand, in the eyes of KCS employees,
including, but not limited to, the Plaintiffs, typically performed his job and behaved with
a very loose, informal, casual, and overly relaxed or friendly joking environment. Such a
managerial style was Mr. Pollard's custom, routine and practice in his Trainmaster role.
Plaintiffs observed and perceived that Trainmaster Pollard openly joked back and forth,
sometimes rather caustically (including smarting off back and forth, cracking jokes,
participating in suggestive banter etc.), with the various employees he had association
with including, but not limited to, Mr. Mode.

22. Trainmaster Pollard typically condoned, participated and even was known to
instigate "grab-ass' behavior at the Heavener, Oklahoma terminal KCS facility.

23. United Transportation Union Local ("UTU") Chairman Glenn Stripling had
observed the very loose, informal, casual, and overly relaxed or friendly joking
environment of Trainmaster Pollard's office since Mr. Pollard replaced Mr. Livingston as
Trainmaster. Mr. Stripling had just a few weeks prior to the subject incidents herein
stated to Trainmaster Pollard that he thought Mr. Pollard's interactions with the

employees were too informal. For all the time Mr. Pollard had been Trainmaster, he had been observed by Mr. Stripling to be "overly" nice to employees including himself, and, namely the Plaintiffs. Mr. Stripling viewed and expressed to Trainmaster Pollard that his informal management style was a potential problem.  Mr. Stripling specifically asked Mr. Pollard, "Where do you draw the line?"

24. Mr. Mode routinely joked back and forth with Trainmaster Pollard whenever they saw one another while working for KCS.

25. Mr. Mode had encountered Trainmaster Pollard in a casino on two separate occasions.  The two men had sat next to one another for quite some while and discussed work and other things as if they were friends, not boss and employee.

26. On December 28, 2011, Mr. Mode and Trainmaster Pollard engaged in their typical and common on the job interaction: smarting off back and forth, cracking jokes, etc.  In fact, Mr. Pollard's greeting to Mr. Mode that very day was, "Good morning, Dick."  Mr. Mode's name is Joshua and he prefers being Josh. He does not go by the name Richard, and certainly, not Dick.  Such exchanges between Mr. Mode and Trainmaster Pollard were common on a daily basis.  Still joking, following some verbal exchange, Mr. Mode, solely and strictly in the continuing spirit of the on-going office jest and banter that Trainmaster Pollard promoted and allowed, "mooned" Mr. Pollard.

27. Co-worker and Plaintiff Mr. Makovy was in a separate room, but saw the interaction between trainmaster Pollard and Mr. Mode through the window.  Mr. Makovy witnessed the laughing and interaction back and forth between Mr. Mode and trainmaster Pollard, but did not see the mooning event itself.

28. After he mooned Mr. Pollard, Mr. Mode carried on laughing with the same

humor as before. Mr. Pollard, on the other hand, seemed to turn suddenly serious. Mr. Mode left the room to complete tying up, but Mr. Pollard told him to come back into his office. He then told Mr. Mode he could have him arrested for what he had just done. Still thinking the men were joking as usual, Mr. Mode quipped, "Well at least I'd have New Year's Eve off."

29. Trainmaster Pollard at that time told Mr. Mode to go on home before he made any rash decisions because of his anger. Mr. Mode was at a loss as to the sudden change in attitude of Mr. Pollard. Perhaps 30 minutes of time elapsed between the time Mr. Mode entered the office to tie-up, and the time he was told to go home.

30. After Mr. Mode was told to go home, he walked out to his car. He was followed outside by Mr. Pollard who caught him as he was pulling out of the lot. Mr. Pollard had him roll down his window and asked of Mr. Mode, "Why did you do that?" Mr. Mode replied with something along the lines of "Well, we got to carrying on like we usually do, and I took it too far, and I'm sorry for that". At that point Trainmaster Pollard told Mr. Mode "As of now, you are dismissed, and don't come back onto the property".

31. Mr. Mode drove away, but after driving around for 15 minutes or so, he returned to KCS Depot and walked back into the Trainmaster Pollard's office to apologize again. He told the Trainmaster that he had thought about what he had done, and again, he apologized, saying he was sorry he had carried it so far. Mr. Pollard at that point said it was too late, and that Mr. Mode needed to leave.

32. Mr. Mode called Mr. Stripling, his union representative, and notified him of the joke-gone-awry incident.

33. On or about December 30, 2011, after formal notice of an investigation was

received; Mr. Stripling investigated the circumstances of the incident. He discovered what he already knew, that the joking back and forth was typical behavior by Mr. Pollard not only with Mr. Mode's crew, but most employees of the Heavener, Oklahoma terminal.

34. Mr. Stripling asked Mr. Mode to provide names of employees who had joked around with Trainmaster Pollard, stating that he would like statements for use at Mr. Mode's investigation concerning and illustrating the informal, overly relaxed, casual, joking environment that existed with Trainmaster Pollard's office management style and behavior.

35. A "Culture of Fear" was instilled into the employees of KCS, including the Plaintiffs, by the past intimidation practices of KCS management, including trainmaster Pollard.

36. As part of the "Culture of Fear" Trainmaster Pollard threatened that he could make any railroad worker lose their job anytime.

37. As part of the "Culture of Fear" Trainmaster Pollard challenged employees to fights.

38. It was common knowledge, and many KCS employees had seen Trainmaster Pollard joke with employees and/or had taken part themselves in such informal work behavior.

39. However, because of the "Culture of Fear" instilled into the employees by the past intimidation practices of KCS, such as the targeting of Mr. Mode for his having filed the previous FRSA Complaint, and trainmaster Pollard's intimidating behaviors of threatening employees jobs or employees themselves, Mr. Mode found that only three co-

workers who would agree to give statements and step up and provide information at Mr. Mode's request to assist him in Mr. Stripling's presentation regarding KCS investigation: Plaintiffs Mr. Johnston, Mr. Makovy, and Mr. Stites .

40.  Mr. Mode provided the names of three of his co-workers, Mr. Johnston, Mr. Makovy, and Mr. Stites to Mr. Stripling to be used as witnesses regarding KCS hearing and investigation of the December 28, 201, joke-gone-awry incident involving Trainmaster Pollard.

41. Plaintiffs provided statements to Mr. Stripling.  These statements included many instances of Trainmaster Pollard using derogatory terms towards Mr. Mode and others, sometimes in jest, sometimes not.

42.  This incident of December 28, 2011, led to Mr. Johnston, Mr. Makovy, and Mr. Stites providing a truthful and accurate account of the work environment to UTU representative Glenn Stripling and, in turn, to KCS.

43. Mr. Mode was targeted by KCS management for discipline and dismissal on account of his having filed the aforementioned 20109 Complaint of February 28, 2011 involving Mr. Livingston.

44. On January 4, 2012, Mr. Mode's investigation hearing was held.  He was charged with conduct unbecoming of an employee.  The statements of Plaintiffs were provided to KCS and read into the record.

45. In providing witness statements for the hearing regarding Mr. Mode being charged by KCS with conduct unbecoming of an employee, Mr. Johnston, Mr. Makovy, and Mr. Stites were uncomfortable and believed they were at-risk they felt in giving their statements because of the "Culture of Fear" and intimidation promoted by KCS.

46. On January 12, 2012, an investigation into the Plaintiffs' involvement with the "mooning' incident was conducted by KCS's Matt Brazeal (Director Employee Relations & Workforce Compliance) and Chad Devenney (Midwest Division General Manager).

47. Mr. Devenney had worked with Trainmaster Pollard in the past.

48. Trainmaster Pollard had previously worked for KCS at its Shreveport, Louisiana terminal.

49. Trainmaster Pollard was terminated by the KCS from the Shreveport terminal.

50. Trainmaster Pollard went to work for a competitor's railroad and was terminated by that railroad.

51. Mr. Devenney hired Trainmaster Pollard at the KCS Heavener, Oklahoma terminal.

52. Trainmaster Pollard bragged to employees that he was re-hired at KCS by Mr. Devenney.

53. On January 13, 2012, Plaintiffs were taken out of service by KCS for alleged failure to cooperate and provide information requested as part of a KCS investigation conducted by Mr. Brazeal and Mr. Devenney.

54. On January 17, 2012, as a direct consequence of the harsh, intimidating, unjust, illegal and retaliatory treatment by KCS against Mr. Mode and the three co-workers, Mr. Johnston, Mr. Makovy, and Mr. Stites, who did nothing more than give truthful statements about the situation in KCS Depot run by Trainmaster Pollard, UTU Local Chairman Glenn Stripling sent a letter to KCS stating: "This letter is to inform KCS that the members of the UTU will no longer participate in any future Safety Committee meetings in Heavener, OK.  The reason for this is because of the ILLEGAL

AND HARSH treatment to employees that turn in statements concerning safety and rule violations."

55.  On January 24, 2012, Plaintiffs Mr. Johnston, Mr. Makovy, and Mr. Stites were ordered to investigatory hearings by KCS.

56. On January 30, 2012, KCS's Mark Redd (Vice President of Transportation) along with KCS's Mr. Devenney went to KCS's Heavener, Oklahoma facility to discuss with Chairman Glenn Stripling and Mr. David Grubbs, Plaintiffs' Union Representatives, the findings of the January 24, 2012 investigations of Mr. Johnston, Mr. Makovy and Mr. Stites resulting in their being taken out of service. While there, the officials informed Mr. Stripling and Mr. Grubbs that one of them would be calling disciplined out of service Plaintiffs Mr. Johnston, Mr. Makovy and Mr. Stites to put them back into service.

57. On January 30, 2012, Mr. Johnston was called by Mr. Devenney and told he was going to be put back into service. Mr. Johnston was chastised and intimidated by Mr. Devanney in his phone conversation. Mr. Devenney stated that although Plaintiffs Mr. Johnston, Mr. Makovy and Mr. Stites were being returned to service, he did not feel they had done their "duty" as employees.  Mr. Johnston was also told that he was not to discuss these events with anyone.

58. On January 30, 2012, Mr. Makovy was called by Mr. Devenney and told he was going to be put back into service. Mr. Makovy was chastised and intimidated by Mr. Devanney in his phone conversation. Mr. Devenney stated that although Plaintiffs Mr. Johnston, Mr. Makovy and Mr. Stites were being returned to service, he did not feel they had done their "duty" as employees.  Mr. Makovy was also told that he was not to discuss these events with anyone.

59. On January 30, 2012, Mr. Stites received a call from KCS's Mr. Devenney notifying Mr. Stites that he would be put back into service and made whole. Mr. Devenney chastised Mr. Stites. Mr. Devenney made it clear that he considered Plaintiffs Mr. Johnston, Mr. Makovy and Mr. Stites all "guilty", even though they were being reinstated. Mr. Stites then asked Mr. Devenney about a conversation the two men had had about pay-shorting sometime in the past. He asked Mr. Devenney if he remembered the conversation, which he said he did. Mr. Stites asked if Mr. Devannay remembered who else was there in the depot during the conversation. Mr. Devenney stated that he couldn't remember who he had had the conversation with, or who else was in the depot. Mr. Stites pointed out that his same inability to remember was exactly what Mr. Stites had been charged for discipline by Mr. Devenney. Mr. Devenney then became livid that Mr. Stites pointed out the hypocrisy of the investigation, went absolutely berserk and started shouting, "This is over with! You don't discuss it with anyone!"

60. Plaintiffs Mr. Johnston, Mr. Makovy and Mr. Stites were reinstated, and all three received back pay for the 18 days that they were held from service without pay during the investigation process.

61. Plaintiffs Mr. Johnston, Mr. Makovy and Mr. Stites, suffered stress during the days and events between December 28, 2011, and January 30, 2012, surrounding Mr. Mode's and their respective KCS investigations in which they participated as truthful witnesses.

62. Plaintiffs Mr. Johnston, Mr. Makovy and Mr. Stites were chastised and belittled verbally by KCS management in retaliation for their involvement in Mr. Mode's and their respective KCS investigations in which they participated as truthful witnesses.

63. Plaintiffs Mr. Johnston, Mr. Makovy and Mr. Stites were all admonished in writing via letters dated January 30, 2012, sent to each of them from KCS management in retaliation for their involvement in Mr. Mode's and their respective KCS investigations in which they participated as truthful witnesses.

64. Plaintiffs Mr. Johnston, Mr. Makovy and Mr. Stites, were harmed and retaliated against by KCS by having admonishing letters placed in each of their permanent personnel files.

65. Subsequent to his reinstatement, Plaintiff Mr. Stites still suffered hostile treatment and retaliatory statements, to wit: he was told by several people at KCS that he was stupid for getting involved, and that he "got what he deserved."

66. Other individuals stated to Chairman Glenn Stripling that they wouldn't get involved because they had families to feed. According to Chairman Glenn Stripling, the brotherhood bond was broken by the actions of KCS, pitting employees against one another and disciplining Plaintiffs Mr. Johnston, Mr. Makovy and Mr. Stites as KCS did.

67. UTU Local Chairman Glenn Stripling has made statements that for the more than 20 years he has been involved, he has never seen Union Brothers so afraid to give statements for each other due to this retaliation against Mr. Mode, and thereafter, against Mr. Johnston, Makovy, and Stites.

68.     KCS reinstated Trainmaster Pollard at the Heavener, Oklahoma terminal.

69. KCS has not done anything to reconcile the damage or improve the work environment or eliminate the "Culture of Fear" at the Heavener, Oklahoma terminal arising out of these events.

70. Perpetuating the KCS "Culture of fear" Trainmaster Pollard, who was off for

only a few days before he was reinstated, is Trainmaster over Mr. Johnston, Mr. Makovy and Mr. Stites.

71. Perpetuating the KCS "Culture of fear" Mr. Johnston, Mr. Makovy and Mr. Stites continue to feel retaliated against and intimidated. They perceive Trainmaster Pollard avoids them and has promoted an environment where they are ostracized. They feel black balled now.  Mr. Johnston, Mr. Makovy and Mr. Stites believe and observed other employees do not want to work with them because they know Plaintiffs Mr. Johnston, Mr. Makovy and Mr. Stites, have targets on their backs.  Also, with the frequent turnover of Assistant Trainmasters, Mr. Johnston, Mr. Makovy and Mr. Stites, are feel intimidation as being marked men and discredited by any incoming Assistant Trainmaster because of the letters and information generated by the KCS within their personnel records.

## ACTIVITY PROTECTED UNDER THE FEDERAL RAILROAD SAFETY ACT, 49 U.S.C. §20109 AND ADVERSE ACTIONS BY KCS

72. Plaintiffs adopt by reference and re-allege each and every allegation contained this entire Complaint as though set forth fully herein.

73. While the "joke-gone-awry" "mooning" incident leading to Mr. Mode's investigation was not a protected activity, Mr. Mode's subsequent termination was excessive punishment and a result of his being targeted by management in for retaliation for  a protected activity under § 20109: filing his February 28, 2011, Complaint against KCS.  As such, the present action is a continuation of the previous action and thus, Federal Railroad Safety Act, 49 U.S.C. §20109 is an appropriate remedy.

74. The actions of KCS in targeting Mr. Mode for retaliation for his exercising his right and duty to report KCS as he did in his prior Complaint of February 28, 2011,

violated the whole purpose of FRSA 49 49 U.S.C. §20109; The Implementing

Recommendations of the 9/11 Commission Act (Public Law 110-53; and the Rail Safety

Improvement Act (Public Law 110-422) to make the railroad more safe and more secure.

As such, the present action is a protected activity and a continuation of the previous

action and thus, Federal Railroad Safety Act, 49 U.S.C. §20109 is an appropriate remedy.

75.     The actions of Mr. Johnston, Mr. Makovy, and Mr. Stites in giving truthful

statements and reporting honestly in the investigation of Plaintiff Mr. Mode, are protected

activities under the FRSA 49 49 U.S.C. §20109; The Implementing Recommendations of

the 9/11 Commission Act (Public Law 110-53; and the Rail Safety Improvement Act

(Public Law 110-422) because such activities comport with reporting to make the railroad

more safe and more secure.

76.     The actions of KCS in retaliating against Mr. Johnston, Mr. Makovy, and

Mr. Stites for giving truthful statements supporting the targeted Mr. Mode, violated the

whole purpose of FRSA 49 49 U.S.C. §20109; The Implementing Recommendations of

the 9/11 Commission Act (Public Law 110-53; and the Rail Safety Improvement Act

(Public Law 110-422) to make the railroad more safe and more secure.

77. The actions of KCS in retaliating against Mr. Johnston, Mr. Makovy, and Mr.

Stites in placing negative letters within their personnel records violated the whole purpose

of FRSA 49 49 U.S.C. §20109; The Implementing Recommendations of the 9/11

Commission Act (Public Law 110-53; and the Rail Safety Improvement Act (Public Law

110-422) to make the railroad more safe and more secure.

78. The actions and retaliation done by KCS against Plaintiffs violated the whole

purpose of FRSA 49 49 U.S.C. §20109; The Implementing Recommendations of the

9/11 Commission Act (Public Law 110-53; and the Rail Safety Improvement Act (Public Law 110-422) to make the railroad more safe and more secure.

79. The actions and retaliation done by KCS against Plaintiffs has effectively defeated the FRSA and rendered the industry less safe, less secure, and more vulnerable to the concerns raised by the 9/11 Commission that prompted the FRSA.

80. The "Culture of Fear" fostered by the actions of KCS against Plaintiffs makes the work environment at KCS's Heavener, Oklahoma facility not only uncomfortable and unpleasant, but patently unsafe.

81. The impact of the herein described actions of KCS on railroad safety is both massive and clear, which makes this issue one of safety and security and thus, subject to Federal Railroad Safety Act, 49 U.S.C. §20109.

## Adverse Actions Against Mr. Mode

82. Plaintiff Mr. Mode adopts by reference and re-alleges each and every allegation contained this entire Complaint as though set forth fully herein.

83. While the "joke-gone-awry" "mooning" incident leading to Mr. Mode's investigation was not a protected activity, Mr. Mode's subsequent termination was excessive punishment and a result of his being targeted by KCS management in retaliation for a protected activity: filing his February 28, 2011, Complaint against KCS. As such, the present action is a continuation of the previous action under Federal Railroad Safety Act, 49 U.S.C. §20109.

84. Trainmaster Pollard, acting in his role of management for KCS, abused railroad rules that were intended for promotion of safety on the job to intimidate and terminate Mr. Mode for the joke-gone-awry incident which Trainmaster Pollard

participated in until he became upset.

85. Trainmaster Pollard and KCS abused railroad rules that were intended for promotion of safety on the job in retaliating against Mr. Mode, who was known by KCS to have filed a prior OSHA Complaint against KCS captioned: *Joshua Mode / The Kansas City Southern Railway Company/ 6-3550-11-05,* in KCS's exercising the excessive punishment of terminating Mr. Mode for the joke-gone-awry incident which Trainmaster Pollard participated in until he became upset.

86. KCS treated Mr. Mode as it did, in subjecting him to an investigation and ultimately dismissing him from railroad employment, to retaliate against him for filing the February 28, 2011, Complaint.

87. KCS treated Mr. Mode as it did, in subjecting him to an investigation and ultimately dismissing him from railroad employment, to intimidate him and make the point to all other employees of what happens to whistleblowers working at KCS.

88. KCS subjected Mr. Mode to an improper investigation and improperly, dismissed him from railroad employment in retaliation for filing the February 28, 2011, Complaint, in violation of 49 U.S.C. § 20109.

89. KCS had knowledge of the protected activities in which Mr. Mode was engaged. In doing so, KCS acted with reckless disregard for the law and with complete indifference to Plaintiff Mode's rights under § 20109. The adverse actions taken by KCS against Mr. Mode were due in whole or in part to Plaintiff's protected activities.

## Adverse Action Against Mr. Johnston

90. Plaintiff Mr. Johnston adopts by reference and re-alleges each and every allegation contained this entire Complaint as though set forth fully herein.

91. Plaintiff Johnston engaged in protected activity under § 20109 as he performed his job duties for KCS.

92.    KCS had knowledge of the protected activities referred to hereinabove.

93. As mentioned above, Mr. Johnston offered a written statement for use in the investigation of Mr. Mode explaining the work environment that existed because of Trainmaster Pollard. The fears and concerns of Mr. Johnston are evident in reading his statement, fears and concerns that management might retaliate or target him for discipline and harassment as they had Mr. Mode. His fears and concerns would prove to be well justified.

94. Concerning Mr. Johnston's statement, which he tried to make as neutral and truthful as possible, Mr. Johnston explained that he had much more interaction with Mr. Pollard than most employees, as he was on an "extra-board" and spent a lot of time in the Depot. Trainmaster Pollard would often joke about him, Mr. Johnston, being on "overtime" too much and other things. It was really a relaxed environment, and he could see how things would get out of hand.

95. Mr. Johnston's statement was read into the record at Mr. Mode's investigation, and was also entered as an exhibit to the investigation.

96. On January 12, 2012, soon after the investigation, Mr. Johnston was asked to meet with Mr. Brazeal and Mr. Devenney after he finished his tasks for the day. He had no advance notice that this meeting was to take place. Mr. Johnston was told that Mr. Brazeal and Mr. Devenney would be interviewing "everyone with knowledge of the Mode/Pollard incident." That, however, was not true. Mr. Johnston, Mr. Makovy, and Mr. Stites were the only people "interviewed" by the two KCS officials.

97. Mr. Johnston provided all the information he could recall at the time, but was worried about the completeness of the information since the event had occurred over two weeks before. KCS official Mr. Devenney "smirked" at Mr. Johnston when he could not recall the details in specificity. Mr. Johnston was concerned Mr. Devenney's actions might mean Mr. Devenney was happy he had found a reason to discipline him Mr. Johnston. Mr. Johnston was very nervous, and informed KCS investigators of such, but they continued questioning him. He grew more and more concerned that they were attempting to find an excuse to discipline him, even though he had not done anything except to offer a truthful statement voicing his observations and opinions. Mr. Johnston was reassured three times that "nothing would happen to him" if he told the "truth".

98. Mr. Devenney and Mr. Brazeal kept asking Mr. Johnston for specific names and dates of people who had similar interactions with Trainmaster Pollard. Mr. Johnston told them that this had been going on for a long time, and that he couldn't speak with specificity as this was just a day-to-day, everyday occurrence. However, Mr. Johnston informed them that although he could not provide specific names, every extra-board conductor, extra-board engineer, and "yard-job guys" would be able to corroborate his statements regarding Trainmaster Pollard.

99. Mr. Johnston also informed Mr. Devenney and Mr. Brazeal that he didn't like coming into the Depot anymore, and did not feel comfortable in that environment. He would try to avoid going in the office whenever possible. During the questioning on January 12, 2012, Mr. Johnston mentioned specific vulgarities that were used back and forth by Trainmaster Pollard and individuals he would be speaking with.

100. The day following his being questioned by the two officials, January 13,

2012, Mr. Johnston called the crew line to find out when he could mark up. He was informed that he could not mark up. He called Beverley (the crew caller on duty) who informed him he had been pulled from service pending an investigation. Mr. Johnston then called Jimmy Wayne Scott, a supervisor, to find out why he was pulled from service. Mr. Scott told Mr. Johnston he couldn't give him any information, and he, Mr. Johnston, would have to sit and wait to learn his charges.

101. Mr. Johnston then called Mr. Stites and Mr. Makovy to inform them he had been pulled from service. They then checked and found that they, too, had been pulled from service.

102. Mr. Johnston received a notice of investigation and said investigation was conducted on January 24, 2012.

103. Mr. Johnston was blameless in the December 28, 2011, "joke-gone-awry" "mooning" incident involving Mr. Mode and KCS's Trainmaster Pollard. The only reason that he was disciplined is that he acted as a witness regarding the incident. The conduct, or more properly stated, misconduct on the part of KCS KCS, as detailed above, is unconscionable and categorically, is a violation of 49 U.S.C. § 20109.

104. KCS subjected Mr. Johnston to an improper investigation in retaliation for his acting as a witness and providing a statement regarding the December 28, 2011, "joke-gone-awry" "mooning" incident involving Mr. Mode and KCS's Trainmaster Pollard, in violation of 49 U.S.C. § 20109.

105. On May 25, 2012, Mr. Johnston was noticed up for formal investigation by Trainmaster Pollard alleging he failed to properly perform his duties in a safe and proper manner.

106. The investigation was held on June 12, 2012. Mr. Johnston was present and represented by his Union Representative Chairman Glenn Stripling.

107. Chairman Stripling made objections regarding the timelines not being correct, witnesses that they were not aware of and not allowed to question.

108. On June 21, 2012 Mr. Johnston received correspondence regarding his discipline, paragraph 4 states the following:

> *Accordingly, for your violation of the above-mentioned rules, and in considering your prior discipline history, you are hereby assessed a sixty (60) day suspension. Thirty (30) days to be served as actual time off commencing June 25, 2012, continuing through and including July 24, 2012 and a thirty (30) day record suspension, which will not be served, but recorded in your personnel file as an actual suspension. You are eligible to mark up for service on July 25, 2012 at 00:01 hours.*

108. Mr. Johnston was again noticed up for investigation on August 12, 2012 by KCS's Antonio McKinney, alleging Mr. Johnston failed to perform his duties in a safe and proper manner.

109. Mr. Johnston was notified on August 15, 2012 "*This investigation has been canceled. You are eligible to return to service immediately.*"

110. The adverse actions taken by KCS against Mr. Johnston were due in whole or in part to Plaintiff's protected activities. In doing so, KCS acted with reckless disregard for the law and with complete indifference to Plaintiff Johnston's rights under § 20109.

**Adverse Action Against Mr. Makovy**

111. Plaintiff Mr. Makovy adopts by reference and re-alleges each and every allegation contained this entire Complaint as though set forth fully herein.

112. Mr. Makovy engaged in protected activity under § 20109 as he performed

his job duties for KCS.

113. KCS had knowledge of the protected activities referred to hereinabove.

114. Mr. Makovy was the conductor on the December 28, 2011 work shift with Mr. Mode. That morning he saw the same joking as he did every day between Mode and Pollard. Mr. Makovy did not see the actual incident of Mr. Mode mooning Trainmaster Pollard as he was on the computer "tying up". Mr. Mode later came to him and related that he had just "mooned" Pollard. Mr. Mode stated, "I think he's mad at me." Mr. Makovy saw Trainmaster Pollard to be really "red-faced" and upset.

115. Mr. Makovy was walking out to a shed after Mr. Mode had gone to his car. He left when he saw Trainmaster Pollard walking away from Mode's car. Mr. Makovy then called Mr. Mode to ask what had happened. He was informed of Mr. Mode having been pulled out of service. Mr. Makovy went back inside the Depot to talk to Trainmaster Pollard about the events, and ask why Mr. Mode had been pulled from service. Trainmaster Pollard simply said that Mode had gone "too far". Mr. Makovy then asked how Mode was supposed to know what is "too far" without the presence of any guidelines pertaining to that behavior. Trainmaster Pollard became agitated and started saying how tough he was, and how he could "whip everyone". This sort of behavior was not uncommon for Trainmaster Pollard. Mr. Makovy relates that he tried to calm Trainmaster Pollard down and make him realize that pulling Mr. Mode out of service was overly harsh considering their history of horseplay; however Trainmaster Pollard would not relent.

116. As described herein above, Mr. Makovy wrote a statement, which was read into the record at Mr. Mode's investigation, and was also entered as an exhibit to the

investigation.

117. Like Mr. Johnston, Mr. Makovy had fears and concerns about the potential for retaliation by KCS for his giving the statement.

118. On the same day that Mr. Johnston was interrogated, KCS officials Mr. Devenney and Mr. Brazeal called Mr. Makovy aside to talk to him about the Mode/Pollard "joke-gone-awry" incident. Mr. Makovy had no objection to this, however, he soon realized the situation was much more serious than Devenney and Mr. Brazeal had indicated. Mr. Makovy felt they kept "grilling" him, asking for names to interview, insisting that he list specific names, dates, and times of previous instances of Trainmaster Pollard's behavior. Mr. Makovy, similarly to Mr. Johnston, said to interview everyone that works out of Heavener, because the attitude and events were so prevalent that anyone could attest to it.

119. Mr. Makovy was held out of service pending investigation, which was held on January 24, 2012. The investigation notice stated that the purpose of the investigation was to ascertain the facts and determine his responsibility, if any, in connection with his making false statements and failing to cooperate and provide information requested as part of a company investigation. The notice advised Mr. Makovy that he was also being investigated for conduct unbecoming an employee for his role in the December 28, 2011 incident where another employee had exposed himself in the workplace. KCS alleged that another employee had stated that Mr. Makovy had dared Mr. Mode to moon Trainmaster Pollard. The accusing employee was not called as a witness to the investigation and separately, denied having said any such thing. Again, the intent of KCS to intimidate its employees and show them what happens to whistleblowers is clear.

120. Mr. Makovy was blameless in the December 28, 2011, "joke-gone-awry" "mooning" incident involving Mr. Mode and KCS's Trainmaster Pollard. The only reason that he was disciplined is that he acted as a witness regarding the incident. The conduct, or more properly stated, misconduct on the part of KCS KCS, as detailed above, is unconscionable and categorically, is a violation of 49 U.S.C. § 20109.

121. KCS subjected Mr. Makovy to an improper investigation in retaliation for his acting as a witness and providing a statement regarding the December 28, 2011, "joke-gone-awry" "mooning" incident involving Mr. Mode and KCS's Trainmaster Pollard, in violation of 49 U.S.C. § 20109.

122. The adverse actions taken by KCS against Mr. Makovy were due in whole or in part to Plaintiff's protected activities. In doing so, KCS acted with reckless disregard for the law and with complete indifference to Plaintiff Makovy's rights under § 20109.

### Adverse Action Against Mr. Stites

123. Plaintiff Mr. Stites adopts by reference and re-alleges each and every allegation contained this entire Complaint as though set forth fully herein.

124. Mr. Stites engaged in protected activity under § 20109 as he performed his job duties for KCS.

125. KCS had knowledge of the protected activities referred to in this entire Complaint which are incorporated by reference as if fully set forth herein.

126.     Mr. Stites was not present at the Depot on December 28, 2011 to witness the Mode/Pollard incident. However, he had seen Trainmaster Pollard interact with employees and knew of the work environment, which concerned him. As such, when asked to give a statement about the work environment for use at Mr. Mode's

investigation, he gladly, but somewhat fearfully did so.  The statement was read into the investigation and attached as an exhibit.

127.    Besides telling much about the work environment from the standpoint of Mr. Pollard's joking and horseplay, Mr. Stites stated as follows:  "Transportation employees, for the most part, do not file complaints against KCS managers out of fear of retribution.  That in itself gives management free rein to do and say as they please.  We as contract employees know that there is a double standard when it comes to conduct within KCS."

128.    On January 12, 2012 Mr. Stites, who is the local UTU President, received a phone call from railroad official Devenney, who was with official Mr. Brazeal.  They "had a few questions for him regarding his statement".  As with the other interrogations, they wanted names of other individuals who had witnessed Pollard's behavior with employees.  Mr. Stites kept being pressured to provide specific names, dates, times and locations of prior incidents.  Finally, Mr. Stites told them as the President of the Union, he was uncomfortable providing them with names without being 100% sure of the authenticity, and didn't want to lie to them.  Mr. Stites believed that if he provided names, while being pressured, that were somehow not factual, KCS would use that as a reason to say he falsified information and to discipline him.  Mr. Stites asked Mr. Devenney and Mr. Brazeal who else they had talked to, and they responded that it was "none of his business".

129. Mr. Stites was held out of service pending investigation for nothing more than giving a truthful statement.  KCS investigation notice stated that the purpose of the investigation was to ascertain the facts and determine his responsibility, if any, in

connection with his alleged failure to cooperate and provide information requested as part of a company investigation. Again, the intent of KCS was clear: intimidate all persons involved to show them and others who would hear about the investigations what happens to whistleblowers and those who give statements.

130. Mr. Stites was blameless in the December 28, 2011, "joke-gone-awry" "mooning" incident involving Mr. Mode and KCS's Trainmaster Pollard. The only reason that he was disciplined is that he acted as a witness regarding the incident. The conduct, or more properly stated, misconduct on the part of KCS, as detailed above, is unconscionable and categorically, is a violation of 49 U.S.C. § 20109.

131. KCS subjected Mr. Stites to an improper investigation in retaliation for his acting as a witness and providing a statement regarding the December 28, 2011, "joke-gone-awry" "mooning" incident involving Mr. Mode and KCS's Trainmaster Pollard, in violation of 49 U.S.C. § 20109.

132.     The adverse actions taken by KCS against Mr. Stites were due in whole or in part to Plaintiff's protected activities. In doing so, KCS acted with reckless disregard for the law and with complete indifference to Plaintiff Stites's rights under § 20109.

### KCS's Adverse Actions Were Retaliatory Against All Plaintiffs

133.     Plaintiffs adopt by reference and re-allege each and every allegation contained this entire Complaint as though set forth fully herein.

134.     KCS's adverse actions against Plaintiffs were in violation of protected activities under FRSA 49 U.S.C. § 20109. Mr. Mode had been the one to file a complaint against a KCS manager and the action against him was in retribution and retaliation against him for making the FRSA 20109 Complaint.

135.    KCS's actions against Mr. Stites, Mr. Makovy, and Mr. Johnston were in retribution and retaliation for making statements which KCS believed to be in favor of the whistleblower that was now being retaliated against.

## REQUESTED REMEDIES

136.    Plaintiffs adopt by reference and re-allege each and every allegation contained in this entire Complaint as though set forth fully herein and for all remedies requested below.

Remedies and Damages for KCS's Violations of 49 U.S.C. § 20109

137.    KCS subjected Mr. Mode to an improper investigation and meted out an excessive punishment improperly dismissed him from railroad employment as described hereinabove in retaliation for filing the February 28, 2011, Complaint in violation of 49 U.S.C. § 20109.

138. Mr. Mode hereby requests a judgment under 49 U.S.C. § 20109 for all relief appropriate under the circumstances, and, for such further relief as is fair and reasonable under law, including but not limited to:

      a.      Reinstatement with the same seniority status that he would have had, but for the discrimination;

      b.      Backpay, with interest;

      c.      Expungement of all adverse references in his personnel record with regard to the events complained of herein;

      d.      Compensatory damages including compensation for any special damages;

      e.      Litigation costs including expert witness fees and reasonable attorney fees;

      f.      Punitive damages.

139.    KCS subjected Plaintiffs Mr. Johnston, Mr. Makovy and Mr. Stites to retaliation as described hereinabove for providing truthful and honest statements

concerning the joke-gone-awry incident involving trainmaster Pollard and Plaintiff Mr.

Mode in violation of 49 U.S.C. § 20109.

140. Mr. Johnston hereby requests a judgment under 49 U.S.C. § 20109 for all

relief appropriate under the circumstances, and, for such further relief as is fair and

reasonable under law, including but not limited to:

    a.    Reinstatement with the same seniority status that he would have had, but for the discrimination;

    b.    Backpay, with interest;

    c.    Expungement of all adverse references in his personnel record with regard to the events complained of herein;

    d.    Compensatory damages including compensation for any special damages;

    e.    Litigation costs including expert witness fees and reasonable attorney fees;

    f.    Punitive damages.

141. Mr. Makovy hereby requests a judgment under 49 U.S.C. § 20109 for all

relief appropriate under the circumstances, and, for such further relief as is fair and

reasonable under law, including but not limited to:

    a.    Reinstatement with the same seniority status that he would have had, but for the discrimination;

    b.    Backpay, with interest;

    c.    Expungement of all adverse references in his personnel record with regard to the events complained of herein;

    d.    Compensatory damages including compensation for any special damages;

    e.    Litigation costs including expert witness fees and reasonable attorney fees;

    f.    Punitive damages.

142. Plaintiff Stites hereby requests a judgment under 49 U.S.C. § 20109 for all

relief appropriate under the circumstances, and, for such further relief as is fair and

reasonable under law, including but not limited to:

    a.    Reinstatement with the same seniority status that he would have had, but for the discrimination;

b.    Backpay, with interest;
c.    Expungement of all adverse references in his personnel record with regard to the events complained of herein;
d.    Compensatory damages including compensation for any special damages;
e.    Litigation costs including expert witness fees and reasonable attorney fees;
f.    Punitive damages.

49 U.S.C. §20109 (e) Compensatory Remedies and Damages

143. Mr. Mode has lost both pay and benefits since his dismissal by KCS and will continue to lose pay and benefits if he is not returned to employment by KCS. Additionally, he has experienced significant stress and anxiety since the unjustified and overly harsh response by Trainmaster Pollard and the ensuing investigation and dismissal. He should be compensated for his stress and anxiety, and he should be either returned to railroad employment by KCS or made whole financially. Mr. Mode typically worked the "Midnight Yard Job" which paid between $200 and $275 per day based upon overtime compensation. Mr. Mode worked 5 days per week for an estimated $1000- $1375 weekly salary. Accordingly, Mr. Mode's yearly salary was approximately $50,000 - $68,750 ($59,375 average) plus benefits estimated at $31,451.50 based upon the 2011 Statement of Fringe Benefits for United Transportation Union members extrapolated for Mr. Mode's expected average salary. With salary and benefits combined Mr. Mode was in line to make approximately $90,826.50 during 2012. Mr. Mode should be compensated for the time he has lost since he was removed from service on December 28, 2011 until if and when he is reinstated by KCS. As of the writing of this complaint, Mr. Mode estimates his lost wages for the past 6 months includes but is not limited $45,413.25.

144. Plaintiffs Mr. Johnston, Mr. Makovy, and Mr. Stites also experienced stress and anxiety over the actions taken against them by KCS. They continue to experience

stress and anxiety from being black-balled and targeted by management. They fear the railroad will retaliate in the future with other trumped up charges or overreaction to some minor infraction. They fear that the letters in their personnel files will impact their railroad careers in the future. They request and are entitled to compensation for their stress and anxiety, and their fears._

49 U.S.C. §20109 (e)(3) Punitive Damages

145. Mr. Mode was admittedly wrong in "mooning" Trainmaster Pollard, but his conduct was brought on by the conduct of Trainmaster Pollard, which mutes the degree of Mr. Mode's blame and absolves him of some of the responsibility for the behavior. One statement relates the incident of Trainmaster Pollard grabbing his crotch and telling Mr. Mode that he had something for him to sit on. Both behaviors are unacceptable, but one can see that with Trainmaster Pollard behaving as he did, he in no way should have reacted as he did to the behavior of Mr. Mode.

146. The inappropriate and illegal reaction by the Trainmaster Pollard and subsequent discipline by KCS officials was overly harsh and can only be explained by the fact that Mr. Mode was targeted for retaliation as a result of his former Complaint against KCS, and the desire by KCS to show Mr. Mode and other KCS employees what happens to whistleblowers.

147. Plaintiffs Mr. Johnston, Mr. Makovy, and Mr. Stites were subjected to overbearing, harsh, illegal, retaliatory and unfair treatment by KCS for doing nothing more than giving statements setting forth their observations and opinions regarding the work environment at the depot, and the conduct of Trainmaster Pollard. Their treatment was in retaliation for giving statements and intended to send a threatening message to

them and other KCS employees about what happens to whistleblowers and employees who would dare to give statements in some way critical of KCS.

148. Treatment such as that to which Plaintiffs Mr. Mode, Mr. Johnston, Mr. Makovy, and Mr. Stites were subjected, instills a "culture of silence" at KCS in which hazardous conditions are masked because employees will be fearful of reporting them.

149. All Plaintiffs, and each of them, respectfully request an award of punitive damages in an amount sufficient to deter KCS from retaliating against employees for exercising their rights under Federal law, and from intimidating employees in order to discourage their reporting concerns and making complaints against KCS. Additionally, Plaintiffs request KCS be ordered to correct and prevent the intimidating and retaliatory behavior by Trainmaster Pollard.

150. Given the extent of the harm KCS causes when employees are treated as Plaintiffs Mr. Mode, Mr. Johnston, Mr. Makovy, and Mr. Stites were treated for exercising their rights under FRSA, each of them - Mr. Mode, Mr. Johnston, Mr. Makovy, and Mr. Stites - respectfully suggest that punitive damages in the full amount authorized by 49 U.S.C. § 20109 (e)(3) is warranted and necessary to send a proper message to KCS and protect other employees from similar treatment. The harm was not only to each of them, but to all other employees working out of or through the depot because of the work environment, which was a compromise of safety and security. The harm caused by KCS shows a pattern and practice of intimidation, retaliation and an extreme disregard for safety on the railroad.

### Attorney's Fees, Costs and Expenses

151. All four Plaintiffs request that all reasonable attorney's fees, costs and

expenses incurred in the making of this complaint and the pursuing of the relief requested

herein be paid by KCS.

## **<u>REQUEST FOR TRIAL BY JURY</u>**

Plaintiffs respectfully request trial hereof by jury.

FITE LAW FIRM


BART FITE, OK Bar No. 10809
P. O. Box 1411
Muskogee, OK 74402
Telephone:     918-683-0309
Facsimile:      918-686-7510
E-mail:            bfitelaw@gmail.com

and


CHIRSTOPHER H. LEACH, MO Bar #
4147

CLAUDIO E. MOLTENI, Mo Bar # 38671
HUBBELL LAW FIRM, L.L.C.
30 W. Pershing Road, Suite 350
Kansas City, MO 64108-2463
Telephone:     816.221.5666
Facsimile:      816.221.5259
E-Mail:           cleach@hubbellfirm.com
                        cmolteni@hubbellfirm.com


*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document was served

electronic and overnight mail on the 13th day of February, 2013, on the following counsel

of record:

James S. Urban, Esq.
Brandon J. Lester, Esq.
JONES DAY
500 Grant Street
Suite 4500
Pittsburgh, PA  15219-2514

*Attorneys for Defendant*